Good morning, my name is Jonathan Milling and together with Amy Zimerchuk, I'm pleased to represent Mr. Young and Mr. Beaulieu in this appeal that is brought challenging their convictions here in the district court in South Carolina. It's an interesting factual situation but I think ultimately this court's determination today is going to depend upon statutory construction and Factually, we've got a situation where my client, Mr. Young, was incarcerated in the South Carolina Department of Corrections for attempting to kill his ex-wife and killing his ex-father-in-law. While he was in the South Carolina Department of Corrections, he gained access to a cell phone and logged into the dark web and started communicating with an individual who he thought was overseas and could manufacture a bond on his behalf. It was unbeknownst to Mr. Young, an undercover FBI agent, who started a dialogue back and forth about what he would like to have ordered and shipped and where it would go. The item, because it was an FBI agent who was on the other side, Agent McCready, actually constructed this device. He manufactured what was to be an inert bomb, a bomb according to the testimony that would actually explode under any circumstances. They did that and I certainly understand and appreciate them doing this to make sure that the public is safe. When we're looking at how the government chose to charge in this case, they charged count one a conspiracy, which is okay. Count two, they charge transporting explosives. The definition in that section 844 is different. They didn't charge a tenth. Okay, that was included. Transport in 844 has included in the definition section specifically includes high explosives and that's what Agent McCready indicated that he was trying to do with a block of inert C4. When he put that in there, he started to shave off a parcel of it that he sent off to Agent Parrott for testing. We don't know from the testimony as to whether or not that was taken from what was ultimately placed in the box or the larger block that had a shaving that was put in the box itself. But when we look at 18 U.S.C. 1716, which is count three, that is the definition or the non-mailable items. It does not include a definition of explosives. And so when we start looking at what is an explosive, that's where we get into the statutory construction. And we look at the plain and ordinary meaning of the word explosive. And in my colleague from across the aisle, Mr. Andrews, his brief cites to Webster's Dictionary and it says it causes an explosion. It is designed to cause an explosion. What we got here was not, could not as a matter of fact have caused an explosion and the agent testified to that. But what we have to also do, and I've cited in my brief that- Mr. Milling, I thought your colleague on the other side recited a dictionary definition of explosive as an explosive substance or reactive. And if that's true, if we accept that definition, why isn't what was mailed in this case an explosive substance or reactive? Your Honor, I would submit it would not be considered an explosive substance because it the infinitesimal amount that was included in that could not have caused an explosion. If we look at the Williams case, 2008, in statutory construction, we need to look at the words surrounding what we've got here. And here the title is injurious articles as non-mailable. And when we get to the explosive section, it goes through all explosives, hazardous materials, inflammable materials, infernal machines, and mechanical, chemical, or other devices or compositions which may ignite or explode. And so it's clear from that. Yes, Your Honor. Yeah, but the FBI agent also testified that it contained all of the essential pieces of a fully functional improvised exploding device. What about that? Except for the fact that it did not have the necessary explosive capabilities in either the detonator, as I recall, or the actual C4 block of C4. It did not have the capability of being able to explode. And I think my colleague, Ms. Zimerchuk, actually in closing argument, destroyed the device there in the courtroom and there was no explosion because it was in fact a safe device. And again, I understand why the law enforcement did this this way because they want to make sure that it was safe. But if we're looking at the intent behind that statute and reading these words together, the whole purpose behind it is to make sure that whatever is being sent through the mails does not have the potential for harming the public. And that's why it's... Mr. Milley, can I have a follow-up? Go ahead, Judge Thacker. No, you go ahead, Judge Dionne. Thank you. Just following up on that. So the statute talks about all explosives, right? And under your reading of the statute, what is to prevent someone who is bound and determined to violate the law to send sort of de minimis amounts of explosives in separate packages, each one of which under your definition would not amount to a violation of the law, but then gather up all those substances at the device. That seems to me a very difficult interpretation of the statute to accept. And, Your Honor, I would submit that that would be a violation of the law because you've got the criminal conspiracy, which our clients were charged in count one with. It's just whether or not this particular parcel by itself was a violation of the statute, whether or not it contained a non-mailable material. And that's where we have to look, in my opinion, at the explosive and whether or not this particular item, as it was submitted through the mails, would have been a violation of the statute. Certainly, we've got other- If the government would have charged attempt, would you have the same argument? With an attempt, I think that it certainly is a different argument. I think that it's very difficult. If he intended to do that, I think the attempt would be problematic for us with regards to this particular argument. Here, I think that this is a scenario where the government, as kids, we called it piling on or dogpiling, where you've already got the charge and you just continue to add on top of it. We've got a conspiracy conviction. We've got the transportation conviction. And the government, being a little bit overzealous, in my opinion, in this case, started to charge additional charges, which just did not meet with the facts of the case. Beyond that, and we talked about this earlier a little bit, the government did not test the parcel afterwards. And so, when we're looking at whether or not the item that was actually mailed by my clients, which is the crux of 1716, whether or not that, in fact, contained any of the high explosives, as Mr. Parrott testified, was present in what he actually tested. And so, when we look at that, there's no evidence to suggest that what was actually sent, what the box, the hoax bomb, if you will, actually contained any high explosives in it. The city school block that was originally sampled does, according to the testimony of Mr. Parrott. But when we're looking at what was actually presented at trial, we don't know what was actually contained within that parcel itself. Now, beyond that, when we're looking at really the meat and potatoes of what we've got here, when we shift over to count four, count four specifically attaches to the count three conviction and the 1716 conviction as the any other felony. Mr. Andrews, in his brief in footnote nine on page 29, they concede that if this item, the count three, is legally insufficient, then count four also is legally insufficient because that was the bridge, if you will, between the two convictions. And that's important here because that is a 120-month consecutive sentence. My client's guideline range before we got there was 324 to 405 months. When you add that on top, we end up with the 525 month sentence, which is a significant sentence. And it does make a difference as to whether or not we've got a consecutive 10 years on top of it. There have been very few cases that have interpreted the explosive portion of 1716. We've got the Wisdom case from the Eighth Circuit that we have cited, and we've got the Hamrick case from this circuit we've cited in our briefs. And in each of those cases, there were other flammable materials which were able to give rise to the convictions at issue in this case. Mr. Mellon, can I ask another question? So under your theory of the case, would this interpretation of the statute put a very difficult burden on postal workers to decide what is an acceptable level of an explosive to allow to be transmitted through the mails? I think that it places the burden on Congress to go back and actually define an explosive like they did in 841 and 844. I think that ultimately is the decision. I think that the postal workers can certainly turn any items that they have concerns over to law enforcement for investigation. I think they would do that anyway. But where we have a situation here is ultimately in the charging decision by the U.S. Attorney's Office, and there were other charges that could and were properly brought. Thank you, Your Honor. Thank you, Mr. Mellon. You've got some time reserved for rebuttal. Ms. Zimerchuk. Thank you, Your Honor. May it please the Court. Amy Zimerchuk. Along with joining that first argument, Mr. Volius has a few separate arguments, and those are the ones I'm going to focus on. They primarily deal with the conspiracy and the request for multiple conspiracies. There were several motions filed by Mr. Volius to separate. So the general conspiracy was under 371, which is the defraud conspiracy. However, and it's clear this operation was named Operation Boom Box. It is clear that the focus of the government in this case was this fake mail bomb. And then as an aside or as maybe a way to loop Mr. Volius in, they added Section D under the 371 when they were identifying the conspiracy, which is the drug conspiracy. The brief that was submitted by the government states that it was a general overall conspiracy, even though the substantive accounts didn't even address the drugs. This is a unique case as the co-defendant, Mr. Young, got up on the stand and actually provided direct testimony of two conspiracies. He said there was the drug conspiracy where they were mailing drugs back and forth to each other, but then there was also the completely separate bomb conspiracy. And in that, so we first argue that there was a fatal variance because of that just significant difference in the drug compared to the remainder of the conspiracy. But even so, we would ask that this court find that the failure to give the multiple conspiracies count, especially in light of the testimony in this case, not only just from Mr. Young, who provided direct testimony that Mr. Volius had nothing to do with this fake mail bomb, and that he only asked him to print a label that didn't even have the intended recipient's name on it. So it wasn't a way for Mr. Volius to recognize that the intended recipient had been married and received a new name. And so there was no way for him to know. Ms. Zimbrichek, can I ask about that? So I get your point that you think that the evidence is disputed with respect to your client's involvement in the bomb plot, but wasn't that a jury question? And how does the instruction on a separate conspiracy help you in terms of having the jury sort that out? So what that does is, in this case, and to answer that, Your Honor, it folds into our third issue, which is the severance of either the defendant or the count. But how that helps, Your Honor, is when a jury is provided an instruction on multiple conspiracies, then they are asked, given the facts, given the facts as presented to you through the case agent, through testimony, through the testimony of Mr. Young, here's your duty as a jury. You may find that there are two conspiracies. If you find that there are two conspiracies, but only charged one, then you must find not guilty if the two conspiracies are not identified in the overall charge. So I'm sorry, with respect to that, I mean, there's no dispute, obviously, that your client participated in the drug ring, right? He's kind of admitted that. So then the jury was simply left to decide whether or not he also participated in this admittedly unrelated plot to kill the wife of the other defendant. That doesn't seem to me to be an overly complicated thing for the jury to sort out on this record and these facts. So it may be, it would have been better to give a separate instruction. But the question is whether or not that was harmless on these facts, assuming that one was required. And we argue, Your Honor, that it was not harmless. There was, and again, it flows into our third argument about the severance, but there was the first few days of testimony, quite honestly, dealt primarily with this bomb plot. And it talked about the past of Mr. Young, the co-defendant who had killed someone. All of this was done without having anything to do with Mr. Rolius. For a jury to have to take the instruction as it was received, which is, the instruction as it was received is, if you can find a conspiracy amongst any of these, A, B, C, or D, or D, and then that's where it becomes not harmless. Because admittedly, and I see that my time is finished, if I may continue. You can go ahead. Yes, go ahead. I just have a quick follow-up, too. Judge Harris also has a question, so go ahead. Okay. And I'll finish that and get to Judge Young. I just have a quick follow-up, too. If he was only involved in D, as the evidence suggests, the jury instruction would have provided clarity as to his overall involvement, which I think they would have then been able to consider and weigh against the evidence whether or not he should be guilty of that charge. Okay, so this goes directly to my question, and I think maybe I'm misunderstanding something. But even if the jury had found he was only involved in D, shouldn't it have convicted on the conspiracy count? I mean, I thought the fact that one conspirator isn't involved in all of the conspiracy's activities doesn't mean there's more than one conspiracy. And if they, given that the drug distribution was charged as an object, if the jury had found, yes, he's involved in the drug distribution with these other guys, weren't they supposed to convict under count one or not? Well, yes, as the jury instruction read. However, if they would have been provided that jury instruction about... Go ahead. I'm sorry. I'm sorry. But even if they had been instructed that, I thought the normal instruction was, look, you can't convict him under count one just because you find that he's involved in some separate conspiracy. That's not enough to convict him on count one. But if they found that the conspiracy he was involved in was the drug distribution conspiracy with all these same people, given that drug distribution is listed as an object of the general conspiracy, why isn't that enough to convict under the general conspiracy? Right. Right. And so that was the issue that we faced because we felt like the reason that if they had been provided the jury instruction, then I don't think that they could have found him guilty under that. Yes, it was charged, although there wasn't a substantive count, it was charged in the general conspiracy judge. Then you have to go back to look at the general conspiracy. It's not just the same actors. And what we're missing here is the same objective, the same goal. And that's where the issue finding a fatal variance in the... That's why we would argue the multiple conspiracy, because the problem is that they did not have the same objective, the same goal. And that was the argument, even though there were same actors involved, they were certainly not... All of their actions in the two different conspiracies did not go towards one common goal. Okay. All right. Thank you, counsel. Mr. Andrews, we'll hear from you. Thank you, your honor, and may it please the court. Your honor, in section 1716, Congress prohibited the mailing of both all explosives as well as devices which may explode. The package that appellants conspired to place into the United States mail to be sent to Shawna Clark did include explosives, explosives known as RDX and HDX, which as the government's expert testified at trial has no other use than to cause an explosion. But it was designed specifically not to explode, wasn't it? That's correct. The device itself, so the package was designed not to explode. That does not make it such that the explosives within it are no longer explosives. And so Judge Thacker... So how is it then a device which may ignite or explode? Well, your honor, our argument would be that it is an explosive, that it's not necessarily a device that may or may not explode. And that those two, those are separate pieces of that single provision. And in fact, the primary mistake that the appellant's argument makes is to conflate those two such to the point where the second or rather the first would be rendered superfluous. If we of the second provision and the first are effectively the same. Rather, we think the plain language of the statute, when we look at the definition in the dictionary, which as we've discussed is a substance that may be used to cause an explosion. Certainly, I don't think anyone can test that RDX and HDX are substances that may be used to cause an explosion. It's our position that these are categorically explosive substances. And that reading of the statute is confirmed as well by the usage of the only explosives experts to testify in this case, who discussed RDX and HDX and referred to them specifically as categorically high explosives. Now, it may be that any of these explosives in any particular compound may not be enough to actually create an explosion. But our statute requires. Take, for example, the instance of sugar. Sugar is categorically a sweetener. But if you were just to drop a pinch of sugar in a large mix of batter, it may not make that batter sweet. So, you know, if you have RDX in this compound, it's not going to make it an explosive device. But it doesn't change the fundamental nature of RDX, which is that it is defined as an explosive and is considered an explosive. I'll point out as well that although this particular statute doesn't include a definition of explosive, this reading of the statute is consistent with the definition that's provided in 18 U.S.C. 844, which prohibits powders that may be used as a non-explodable device. And in our view, that's all the statute requires. I've discussed the plain language, the rule against superfluity. I would also mention that the appellant's construction, despite their discussion of public health and safety, really undermines the public policy goals of health and human safety. As Judge Diaz rightly pointed out, surely it can't be that Congress intended people at home to be determining what amount of RDX, HDX, or TNT is an appropriate, safe amount to place into a package as it goes into the mails. In fact, rather, we think that the more natural reading of the statute is that Congress simply intended to draw a bright-line rule that no one should be mailing RDX, HDX, or other explosive chemicals or compounds. Many of these compounds tend to be highly volatile. When placed in the United States mails under one condition, you don't know if that condition will change upon mailing. And so, Mr. Anders, can I ask about that as a follow-up? Just Thacker mentioned this to your colleagues when they argued. So there would have been nothing to prevent the government from charging an attempt in this case. Is that right? That's correct, Your Honor. And I suppose the government could have simply inserted in the package sugar, to use your example, as opposed to a finite or small amount of explosives. And so long as the defendants had intent to commit the offense, they could have been charged under the attempts statute, right? That's correct, Your Honor. Okay. So the reason I ask that is I suppose there's nothing to prevent the government from charging the case the way it did. But I was concerned, frankly, that there was some evidence in the record, and you just mentioned this, that even a small amount of explosives sent through the mails could change their condition and explode. So I wasn't sure why the government felt it appropriate to send even a small amount of explosives through the mail, because even that amount, it seems to me, had some level of potential for a difficult result. Well, Your Honor, I can't speak with certainty, but I would imagine the view was that that's the statute requires. It does inquire that for it to be a non-mailable item, it would need to include an explosive. And to come back to the public safety concern, I mean, obviously... I'm sorry, counsel. Counsel, can I just stop you there? I feel like that didn't quite answer the question. That sort of presumes, well, we have to charge a completed offense under this statute. But I thought the question was, and I agree, if that's your starting point, you better put some explosives in the mail. But why did the government, given the risks, make that charging decision, I think was the question. Right. Thank you. Thank you, Judge Harris. And I apologize. A much better framed question than the one I gave you. Candidly, Your Honor, I cannot answer why the government chose to make one charging decision or another. But to the risks that you mentioned, I would point out that this device was constructed by experts at the FBI who satisfied themselves that this was incapable of causing injury to any of the targets in this case or any of the investigators. And it did not, in fact, travel through the mail. We believe, for the purposes of the statute, it was placed in the mails. Mr. Fears deposited it at a mailing location, but then it was immediately picked up by law enforcement officers. And so it did not travel on a bus or an airplane or anything like that. So we don't have any disagreement. In fact, we concede that the package was not going to explode. The primary difference between our view and theirs in this particular case is whether just the existence of these categorically explosive materials was in violation of the statute itself. I'll point out another piece about the language in this statute as well. If you look at this particular paragraph, you can see that it prohibits a long list of different types of articles and materials. Prefacing each one of these independent clauses is the word all. And what you see is in 1716A, there is a broad prohibition on a number of categories of potentially hazardous articles and materials. And then below that is a list of specific objections. And so, for instance, at the very top, if we look at poison, the statute bans poison and mixtures containing poison. Now, it doesn't identify a particular concentration of poison. There is no information in the statute that tells us how much poison is allowable or how little is allowable. And I think that the fair reading there is that no poison is allowable, just as this fair reading is that people should not be sending RDX, HDX to one another in any amount. I would point out as well, poisonous animals. I think a fair reading of the statute is that no one should be mailing rattlesnakes to one another, full stop. And that would be the case even if a snake, for whatever reason, had been drained of its venom or perhaps some type of disorder where it did not produce poisonous venom. I think the best reading here is that the United States Postal Service does not want people mailing poisonous animals of any kind. And if one were to look for an exception, it would be below, where you see that scorpions are mailable for certain medical purposes. And so, we know that where Congress creates exceptions and where we start with a broad prohibition of different categories, that we shouldn't be reading additional exceptions into the statute. One last point I'll make on this before I turn to the conspiracy issues, if there's no other questions, is that in the immediately preceding subsection, or rather section, which is section 1715, Congress also outlaws the mailing of handguns, pistols, revolvers, other concealable weapons. It doesn't just outlaw the mailing of loaded guns or unlocked guns. It prohibits the mailing of all types of guns, whether they're loaded or unloaded. And as we all know, an unloaded firearm can't fire a bullet. So with that, I'll turn to the conspiracy issues, if there's no further questions on the explosion piece. As to the appellant's arguments regarding the conspiracy, I think that they only make sense if the court disregards the evidence in the record that Vance Vollius did, in fact, participate in the plot to mail a bomb to Shawna Clark. The entire argument about there being a variance rests on the premise that the evidence at trial doesn't line up with the facts as alleged in the indictment. But the facts as alleged in the indictment, specifically the overt acts that Mr. Vollius was alleged to have participated in, in furtherance of the conspiracy, are that he received shipping labels for the bomb from Mr. Young, that Young and Vollius spoke on the phone about the shipping labels. We saw Mr. Meredith's testimony at trial regarding that, as well as text messages introduced between Mr. Meredith and Mr. Young, indicating that he had been speaking with And additionally, we know from Mr. Feers' testimony that Vollius, in fact, provided the shipping labels for the bomb to Mr. Feers at Mr. Feers' house, at which point they had a conversation about the target of the bomb, Ms. Clark. Mr. Vollius indicated that he knew it was going there, and he indicated he did not want his fingerprints on the shipping labels. So that's the evidence that the jury heard. It's also exactly the allegations that are in the indictment. And through the testimony of Meredith and Feers, the jury also heard about the connection between the drug conspiracy and the conspiracy to send a mail bomb to Ms. Clark. We have the overlapping actors here, and we have the overlapping methods. And the goal was to continue the criminal enterprise and to enrich themselves. What you see is that Mr. Young had created a drug distribution network that gave him hands on the outside world. Mr. Young, of course, was incarcerated, but Mr. Vollius, Mr. Feers, and Mr. Meredith each played a role in serving him on the outside of the prison. And in return, Mr. Vollius, Mr. Feers, and Mr. Meredith received from Young a source of drugs, a very large amount of drugs, I might add, and money, a steady flow of income and drugs for each of their purposes. And so there was a natural relationship here, and the bomb plot would not have been possible without the foundation and the framework that the drug conspiracy built. Can I, so can I, let me ask, go ahead, Judge Harris. No, no, you go, Judge Diaz, go first. So if, in fact, there had been no evidence that Mr. Vollius had any inkling about the bomb plot or been involved in any way about in the bomb plot, is it the government's contention that he nonetheless would have been on the hook as a conspirator for what would have been a completely unrelated crime? And if so, how? No, Your Honor, the government bears the burden of establishing by beyond a reasonable doubt every object of the conspiracy in this case. And we did that. In fact, if the court were to look at the last three pages of the supplemental joint appendix, you will see the special verdict form from the jury in this case for Mr. Vollius, where the jury found not only each count guilty, but each individual object of the conspiracy they independently appraised and found him guilty of as well. If for some reason they had said, you know, they'd looked at the evidence and they found him not to be guilty of one of the objects, I think they certainly would have understood that. In the cases that this court has evaluated, I look back to Kennedy, for instance, in which, and Judge Diaz, I believe you alluded to this earlier in one of your questions to the appellant. But even if there is a variance, the question of whether it's a fatal variance is one that requires a demonstration of actual prejudice. And what this so many potential conspiracies that the jury is going to be overwhelmed or confused or more likely to confuse evidence of one conspiracy with another. In Kennedy, there were eight defendants and three conspiracies. Here we're talking about two defendants and two conspiracies. So that chance and that risk of confusing evidence in one conspiracy for another, and for the defendant being painted, you know, unfairly with that brush was very low here. If we had charged these conspiracies separately, there's no indication in the record it would have made any difference. The same witnesses would have been called with the same evidence. And this is true, by the way, even if the cases were severed, he still would have had the testimony from Mr. Fierce, still would have had the testimony from Mr. Meredith. All of the same would have been there. And all of the same inferences and conclusions would have been able to be drawn from the jury. I'm sorry, this is Judge Harris. Can I ask you just to go back? I didn't catch what you said at the end of your first of your answer to Judge Diaz's question. The special verdict forms here show that the jury found the defendant guilty on all four of the objects. But what would have happened if the jury had only checked the drug distribution one, in your view, in my view? And I think Griffin from the United States, what is the government's position? Our position is that he would be guilty for the count for count one, for sure. He'd be guilty of the conspiracy. Now, I think, you know, in terms of which objects he is guilty for, that may come into play at sentencing. It would not change his guilt on the ultimate, on the ultimate count. And I think that's fairly well established. And so I'll just one quick point about the multiple conspiracy charge. I think it fares the same way as the fatal variance analysis, but also like the fatal variance analysis, we still have to look for, you know, even if the charge should have been made. And I think that the standard has been articulated by this court in Kennedy, as well as Nunez and Squillicote, that multiple conspiracy instruction is not required unless the proof of trial shows appellants were involved only in a separate conspiracy. But even in assuming that a charge was required, it's only reversed upon a showing of substantial prejudice, which this court has said requires that the jury probably would have acquitted without that instruction. And again, our position would be there's just no reason to believe that would be the case, given the substantial evidence that supports Mr. Valle's conviction. And I have a little bit of time left on the clock. I'm happy to answer any further questions that the court may have. I just am having trouble wrapping my mind around this, some of this conspiracy stuff. Just your last sentence that given the substantial evidence supporting his conviction, do you mean given that there's substantial evidence supporting that he was your argument the same if there were only substantial evidence that he was involved in drug distribution, which was charged as an object of the conspiracy? Which do you mean? Thank you, Your Honor. Both, all of the above. I was specifically talking about the bomb plot because I don't believe that the drug plot is at issue. I think, in fact, they've conceded that he did, in fact, conspire to sell drugs. That issue is certainly enough to get a guilty verdict as to count one. But this question of the bomb plot, which they have raised, and primarily is the focus of their concern, and I think the focus of, you know, at least their suggestion that there's not sufficient evidence in the record to support Valle's connection to it. My assertion about the substantial evidence really extends to the bomb plot. And my only other question is, you know, we talked about the single versus multiple conspiracy and overlap of actors and methods. And then when we got to goals, you were talking at a pretty high level of generality about, well, I mean, I can't quite remember what it was, but just kind of keep the criminal stuff moving. I mean, do we have cases that look a lot like this one where the two objects of the conspiracy are so different from each other? I feel just in sort of, I haven't done a detailed accounting, but it seems like most often it's like, well, they're dealing drugs in place A, but they're also dealing drugs in place B. So it's one conspiracy. I mean, these seem quite divergent, a bomb versus drugs. And the bomb has nothing to do with the drug conspiracy. You know, it's not that they're trying to take out a competing drug supplier or something. Your Honor, I don't have a great illustrative case on point, but I would refer you to, there's a case called United States versus Stewart. And I apologize, I'm not sure if it's in our briefing. It's one I came across in preparation for argument. And in United States versus Stewart, which is from this court in 2001, the court talks about the term interdependence in the course of evaluating a conspiracy. And this concept of interdependence is that, you know, if there's actions on one part of the scheme, and Your Honor, I see that I'm out of time. You can go ahead. Go ahead, Mr. Andrews. That's your answer. The, if there is an action on, in one part of the scheme that is designed to, that is necessary to further some other action of the scheme, or to, that is necessary for the entire scheme to be successful, then those two are interdependent. And so I do think that this concept of interdependence is important here. I don't believe that Young would have had the resources to put together a scheme that would have not been mailing and distributing illegal drugs with the help of these people for the preceding six months. When he wanted to try to kill his ex-wife for the second time, he knew exactly who he could turn to and exactly who he could trust. And if there's no further questions, thank you. Thank you, Mr. Andrews. Mr. Milling, you have some time before rebuttal. Thank you, Your Honor. May it please the court. And I guess I'd like to start with really where Mr. Andrews started talking about the language in 1716 and his reference to appellants reading of that statute, rendering certain language and certain phrases superfluous. As I read this, I see a list of a series of different non-mailable items that all may which is a catch-all. And that's where it reads, or other propositions which might ignite or explode, which shows the concern, the overall concern of this as being mailing of items that might be injurious. I don't know if Mr. Andrews has any children or not. I've got four kids. And as I'm trying to explain to them what to do and what not to do, I've learned you've got to put that catch-all in there and telling them what not to do or they're going to come back and tell me not to do that. And so that's where Congress, I think, was coming in and defining this statute. It lists a series of things that might ignite or explode on their own. And then we've got a catch-all phrase which says, or anything else that might explode. When we look at the first part that Mr. Andrews also pointed to, poison and articles of composition containing poison and all poisonous animals and insects. What I think we've got here is a situation where we're not suggesting that we're going to send a rattlesnake through the mails that doesn't have any venom in it, but rather, according to Mr. Andrews, this would also criminalize the mailing of a rattle off of the back of a rattlesnake, which has no poisonous properties at all. And so where we are here is likewise with the prohibition of mailing guns. Guns are made out of metal. You can mail metal through the postal service, which could ultimately be used to create a firearm. But where we're, I think, having a problem here is when he talks about putting sugar in there. If the statute says you can't mail a cake and the cake doesn't have sugar in it, is it in fact the cake? And the testimony, and I pulled it from my brief while he was talking, joint appendix pages starting on page 525, Agent McCready gives pretty clear testimony. Contrary to what Mr. Andrews talks about as far as this being an item that could have changed during the mails and become explosive, Agent McCready says this was not going to explode. This was safe and that's why we set it up the way that we set it up. It's not going to explode. And I alluded to this earlier with Ms. Zemechek's closing argument as to how she destroyed the item there in the courtroom and it did not, in fact, explode. We've got a statute which does not... But the part, what about the beginning part where it just says and all explosives, hazardous materials, blah blah. It just says and all explosives. It doesn't connect it with the may ignite or explode. That's a different clause that starts with a separate and. Yes, Your Honor. And I think that when we're looking at, when it says explosives, that's where we have to look at because there's no definition of what is the explosive. And that's where Congress in other statutes has defined explosives to include the presence of high explosives. But they didn't do that here. And I think that when we're looking at statutory construction, when Congress has clearly expressed the ability to define a word like they did in 844 when they defined it a certain way in 841, they don't define it here. And so we have to use the common and ordinary meaning and using it in context within this particular statute. And that's where we... Yes, Judge Harris. I'm sorry. So counsel, I want to make sure I'm clear. How much of your argument depends on the existence of this clause in the statute that says other devices or compositions which may ignite or explode? Is your argument now that, take that out, even if it didn't include that, you would be arguing this was not an explosive? Yes, Your Honor. Okay. So you don't need that last clause. Forget the last clause. Correct. Basically, the portion of, I mean, it is clear that this device, this box, this portion was not going to explode. The first portion, whether or not it included explosives itself, because explosives is not a defined term, we have to look at it in context within that particular statute in discerning whether or not what is there. Yes, sir. Mr. Milley, I'm a little bit confused. I thought you said that the catch-all was important and you used the example of your kids. Your kids need a catch-all. And by the way, I tried that catch-all with my kids and they don't work. So which one is it? Yeah, okay. Does it matter or doesn't? I think that that phrase is a catch-all, which it helps us interpret what is the meaning of explosives. It is a separate way that can in fact violate the statute. I think that it is useful and helpful in discerning exactly what Congress's intent was. I think that it is helpful in understanding what context an explosive is when used in this statute. And there, our position is explosive means it has to be able to ignite or explode because we're using it in context and injure people if it's actually submitted in the mails. Okay, thank you. Thank you, Your Honor. All right, thank you very much. The case has been ably argued. I want to thank all three lawyers for their presentations here this morning. We would typically come down from the office. We cannot do that, but please know that we are grateful to you for helping us with this interesting and difficult case. And Ms. Zymchek and Mr. Milling, in particular, I want to thank you both because you were both court appointed and we could not do the important work that we do without lawyers who are willing to take on cases. As court-appointed counsel, you ably discharged those duties here today, as did Mr. Andrews on behalf of the government. So thank you very much and please be careful and stay safe. Thank you very much. Thank you, Your Honor. Thank you.
judges: Albert Diaz, Stephanie D. Thacker, Pamela A. Harris